# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

---

In Re:

JOSEPH VERNON BROCK,

**Debtor.**

**Bankruptcy Case
No. 08-01493-JDP**

---

FIVE STAR ENTERPRISES, INC.,

**Plaintiff,**

vs.

JOSEPH VERNON BROCK,

**Defendant.**

**Adv. Proceeding No. 08-6087**

---

## MEMORANDUM OF DECISION

---

**Appearances:**

Laura E. Burri, RINGERT LAW, Boise, Idaho, Attorney for Plaintiff.

Randal J. French, BAUER & FRENCH, Boise, Idaho, Attorney for Defendant.

MEMORANDUM OF DECISION - 1

### *Introduction*

In this adversary proceeding, creditor Five Star Enterprises ("Five Star") alleges that its prebankruptcy state court judgment against chapter 7[1] debtor Joe Brock ("Brock") is nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6).  Docket No. 1.  The Court conducted a trial on April 3, 2009.  After considering the testimony and evidence, the arguments of counsel, as well as the applicable law, this Memorandum disposes of the issues and constitutes the Court's findings of fact and conclusions of law. Rule 7052.

### *Findings of Fact*

Sam Hiskey ("Hiskey") has been a professional truck driver since approximately 1989.  He was the president of Five Star; his wife, Margaret Hiskey[2], was the company's vice president and secretary.

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

[2]  For clarity and convenience, the Court will occasionally refer to individuals by first name.  No disrespect is intended.

MEMORANDUM OF DECISION - 2

Hiskey, acting though Five Star, conducted business as an owner/operator (or "trucker"), meaning that he owned and operated a truck and trailer which he would "lease on" to a carrier. Under this common arrangement in the trucking business, a carrier contracts with a shipper to haul a load, and a bill of lading is issued. The carrier dispatches a trucker to pick up and haul the load to its destination. At the destination, the bill of lading is signed by the recipient and returned to the carrier by the trucker. The shipper then pays the shipping charges to the carrier, and the trucker and carrier divide the income based upon some contractually agreed-upon percentages.

In February, 2000, Five Star, through Hiskey, leased on to Timberline Transport ("Timberline"). Brock, with his now ex-spouse Debra Brock, were the principals of Timberline. Brock also drove a truck for Timberline.

MEMORANDUM OF DECISION - 3

On February 17, 2000, Hiskey signed an Equipment Lease Agreement (the "Agreement") and began hauling loads for Timberline.[3] The Agreement provided that "Carrier [Timberline] shall pay Lessor [Five Star] a share of the revenue received by Carrier or other consideration for each use made by Carrier of the Equipment which is calculated in accordance with Exhibit B attached." Ex. 200, ¶ 2. Exhibit B specified that Five Star would receive ninety percent of the gross shipping price. Ex. 200. From this ninety percent, Five Star had to pay all its operating expenses, including truck maintenance, fuel, and taxes.

The Agreement also provided that "Carrier shall pay Lessor all sums owed it for each trip . . . within 15 days after completion of the trip and delivery by the Lessor to Carrier of all delivery receipts, bills of lading, driver's logs, and other evidence of delivery." Ex. 200, ¶ 2. However, it is

---

[3] There is conflicting evidence about the origins of the written agreement signed by Hiskey. However, the parties agree that it was a form used by Boise Cascade, where both Sam Hiskey and Brock used to work, which was altered to reflect the parties as Five Star and Timberline.

MEMORANDUM OF DECISION - 4

undisputed that, from the inception of the Agreement, Timberline and

Brock did not pay Five Star within the required fifteen-day window.

Timberline provided Hiskey a monthly settlement statement

detailing dates, load numbers, destinations, the load pay, Five Star's gross

pay, and Timberline's ten percent.  Exs. 104, 105.  The statements also

indicated the amount paid by Timberline to Five Star and the

corresponding check number.  *Id*.  In addition, Hiskey kept track of his

loads independently via trip envelopes he kept in his truck.

Timberline paid Hiskey for all loads hauled in 2000, but not within

fifteen days.  Beginning in the summer of 2001, the delay in payments

from Timberline grew longer, apparently due to the fact that shipping

customers were slow in paying Timberline.  During this time, Timberline

made attempts to collect unpaid invoices, and even consulted an attorney

for advice.

As a result of the delayed payments, Five Star began to experience

financial difficulties.  To operate, Five Star had to purchase fuel and pay

road taxes regardless of whether it in turn received payment for a load

MEMORANDUM OF DECISION - 5

from Timberline. Five Star also was required to make a $1,600 truck/trailer payment each month.

Hiskey testified that he spoke to Brock several times about the need for payment on a current basis. While he was sympathetic to Five Star's predicament, Brock testified that he reminded Hiskey repeatedly that his practice was to pay Five Star as soon as Timberline received payment for the loads which Five Star hauled.[4] Brock assured Hiskey that Timberline would make an effort to collect from customers and get caught up on amounts owed to Five Star.

In December, 2001, Five Star received payments totaling $11,085.55 from Timberline; only $765 was paid in January, 2002. Exs. 104, 105. In February, 2002, Hiskey discontinued working for Timberline for approximately six weeks, in part to take personal time off to be with his daughter, but mostly because he was unable to buy fuel to haul loads.

---

[4] In his testimony, Brock seemed fairly uninformed about the status of Timberline's accounts receivables, perhaps because that information was maintained by Debra Brock, who did not testify at trial.

MEMORANDUM OF DECISION - 6

In March, 2002, in response to expressions of concern by Hiskey,

Brock agreed that Timberline would give its ten percent of the gross

revenue generated from any loads to Five Star in an effort to make up the

amounts owing.  Ex. 101.  As a result of this arrangement, Hiskey accepted

trips on March 19, 2002 and April 5, 2002.  Five Star was never paid for

those two loads.  Ex. 101.  In May, 2002, Hiskey terminated his contract

with Timberline and leased on to another carrier.

Discussions between the parties about the payment of the balance

due from Timberline to Five Star continued for some time.  Margaret

Hiskey kept the books for Five Star, and she compared Sam's trip envelope

information with the settlement statements provided by Timberline.  Ex.

101.

As between the parties, there was no disagreement concerning the

amounts owed until August, 2002, when two payments appeared on the

settlement statement that Margaret had no record of receiving.  Ex. 106.

According to Debra Brock, these payments allegedly compensated Five

Star for load numbers 99-3-13 and 99-4-20.  Margaret questioned Debra

MEMORANDUM OF DECISION - 7

about the phantom payments, asking to see copies of the payment checks

for those loads.  In the meantime, Margaret obtained copies of cashed

checks from Timberline from her own bank, and compared them with

copies she had made of checks from Timberline prior to their being cashed.

Margaret's bank copies and her own copies were identical.

Debra faxed copies of the purported checks to Margaret.  The faxed

copies of checks had obviously been altered.  *See* Exs. 106, 121, 122, 123,

and 124.  On some checks, the check number and amount are correct, but

the load numbers in the memo line had been altered.  Exs. 107, 122.  In

other instances, the check number was altered.  Exs. 106, 121.  Whoever

altered the checks (likely Debra Brock) apparently did not realize that the

long number at the bottom of the check contains the check number, and

she failed to alter that number as well.  Margaret had been taught through

her employment to detect check fraud and immediately noticed the

alterations.

Soon after he left Timberline, Hiskey, through Five Star, had a

$20,000 balloon payment due on the truck and trailer.  As a consequence of

MEMORANDUM OF DECISION - 8

not being paid for loads hauled, Five Star could not make that payment

and had to refinance the loan, at considerable expense. Had Five Star been

paid for the hauls completed, it would not have needed to refinance the

truck loan.

In 2004,[5] Five Star sued the Brocks and Timberline in state court to

collect the unpaid amounts. After a trial, the state court therein issued

findings of fact, conclusions of law, and a judgment in favor of Five Star

for $38,854.79.

Brock filed a chapter 7 bankruptcy petition on July 23, 2008. Five

Star commenced this adversary proceeding, seeking an exception to

discharge, on October 27, 2008.

### Conclusions of Law and Disposition

Five Star argues that its judgment against Brock is excepted from

discharge under §§ 523(a)(2), (a)(4) and (a)(6). Five Star has the burden to

prove each of the elements necessary to show its debt is excepted from

---

[5] While the state court complaint is not in evidence, the Court deduces the
year the action was filed by its case number, CV-04-4364. Exs. 115-118. The
precise year is immaterial.

MEMORANDUM OF DECISION - 9

discharge by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

A.  Issue Preclusion.

Five Star contends that the state court judgment is entitled to full faith and credit in this Court, and that relitigation of the same issues adjudged therein is barred.  The Court agrees with this fundamental premise.  Issue preclusion, formerly called collateral estoppel, applies in § 523(a) dischargeability proceedings.  *Gamble v. Overton (In re Overton)*, 09.1 I.B.C.R. 19, 21 (Bankr. D. Idaho 2009); *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1123 (9th Cir. 2003).  In Idaho, issue preclusion protects litigants from litigating an identical issue in a subsequent action between the same parties.  *Wernecke v. St. Maries Joint School Dist. No. 401*, ___ P.3d ___, 2009 WL 982690 *9 (Idaho April 14, 2009).

However, while in many bankruptcy actions the application of issue preclusion can determine the outcome, the reach of that doctrine is not unlimited.  Indeed, in this contest, Five Star seeks to extend the

MEMORANDUM OF DECISION - 10

application of the doctrine beyond the issues actually litigated in state court. That is impermissible.

In the state court action, Five Star alleged that Brock and Timberline were indebted to it for the unpaid balance due for hauling loads under the Agreement. As a breach of contract action, in this litigation, the reach of issue preclusion is limited to the state court's determination of the amount of the judgment debt, and to the state court's findings and conclusions regarding the defenses asserted by Brock to the state action, namely estoppel and waiver. No other issues relevant to the dischargeability of Five Star's judgment were litigated in state court and Brock has made no attempt to relitigate the judgment amount, nor has he argued the defenses of waiver and estoppel before this Court. Rather, Brock contests Five Star's § 523(a) theories on the merits.

Accordingly, the outcome of this action is not controlled by issue preclusion.

MEMORANDUM OF DECISION - 11

B.  § 523(a)(2)(A).

The Code excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained, by (A) false pretenses, a false representation, or actual fraud . . . ."  11 U.S.C. § 523(a)(2)(A).

1.  Elements.

In order to succeed on this exception, Five Star must prove that: (1) Brock made a representation to Five Star; (2) which at the time he knew was false; (3) the representation was made with the intent to deceive; (4) Five Star, through Sam or Margaret, relied on the representation; and (5) Five Star sustained the alleged loss as the proximate result of the representation.  *Farmers & Merchants State Bank v. Cracchiolo (In re Cracchiolo)*, 00.2 I.B.C.R. 84, 86 (Bankr. D. Idaho 2000) (citing *American Express v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996).

2.  Analysis.

Five Star identifies three allegedly false representations which were made by Brock or Timberline and upon which it relied to its detriment. The first was a statement allegedly made by Brock to Hiskey in mid-2001,

MEMORANDUM OF DECISION - 12

that Five Star would be paid $5,000 that day. The second is a statement

allegedly occurring some time in approximately March, 2002, whereby

Brock allegedly enticed Hiskey to haul more loads for Timberline by

offering to pay Timberline's ten percent share of any revenue from those

loads to Five Star in an attempt to get caught up with back payments.

Finally, in its brief, Five Star argues that the altered checks constitute false

representations concerning payments that had allegedly been made by

Timberline to Five Star.

With regard to the first alleged misrepresentation, the evidence

concerning this statement is equivocal. While Hiskey testified it occurred,

Brock specifically denied making any such statement. The Court finds

Hiskey has not shown by a preponderance of the evidence that the alleged

statement was actually made.

However, even if this statement was made, under these

circumstances, it cannot support an exception under §523(a)(2)(A).

Assuming Hiskey was told by Brock that he would be paid $5,000 by the

end of the day, Hiskey testified that when he went to collect the $5,000,

MEMORANDUM OF DECISION - 13

Debra Brock told him that Timberline did not have the money.  He further testified that a week or so later Five Star received "about half" of the $5,000.

While Hiskey testified that he relied on Brock's  promise of $5,000 and continued to work, the evidence shows otherwise, and the Court declines to find that was so.  The same day he was supposedly assured he would be paid, he was informed by Debra Brock that Timberline did not have $5,000.  He did not testify that Debra Brock made any further assurances to him; only that Five Star received about half of the $5,000 a week or so later.  Because Debra Brock essentially negated the impact of Brock's statement prior to Five Star hauling any more loads, Five Star could not have relied on that statement to its detriment.

The second alleged misrepresentation involves Brock's promise to pay Five Star Timberline's ten percent of revenue in March, 2002.  While such a statement by Brock was surely made, the Court declines to find that it was false when made.

MEMORANDUM OF DECISION - 14

The record clearly indicates that Timberline did in fact pay over its ten percent to Five Star on multiple loads beginning in March, 2002. Exhibit 105 shows that for all the payments Timberline made to Five Star, beginning approximately March 1, 2002, it paid Five Star its own ten percent in addition to the ninety percent owed to Five Star pursuant to the Agreement. If Five Star did not get its ninety percent share for a load, it likewise did not receive Timberline's ten percent.[6]  Accordingly, on this record, Five Star has not shown that Brock's representation was false.

Finally, in its brief, Five Star argues that the altered checks submitted by Debra to Margaret constitute false representations concerning payments that had allegedly been made, and that somehow these supposed additional payments were something Five Star relied upon to its detriment. But Five Star's proof fails on this point, as well.

---

[6] There was discussion at trial whether the ten percent was paid to Five Star in order to help Timberline "catch up" with payments owed to Five Star, or whether it was essentially an advance, and intended to be paid back when other accounts receivable were paid. This distinction is immaterial to the Court in resolving the dischargeability issues raised here.

MEMORANDUM OF DECISION - 15

The testimony indicated that the "payments" in question were for two separate loads. According to Debra, the phantom "payments" were allegedly made to Five Star on May 31, 2002. Ex. 102. However, the testimony is clear that, after not working for six weeks or so in February, 2002, and being enticed back to work with the promise of the additional ten percent payment, Hiskey hauled two more loads for Timberline, on March 19, 2002, and April 5, 2002. He testified that he quit at the end of April or beginning of May, 2002. If the alleged payments were made on May 31, 2002, then Hiskey could not have relied upon the altered checks to provide additional services to Timberline, because he had already ceased doing business with Timberline by that time.[7]

Five Star has shown no basis to conclude that its debt should be excepted from discharge under § 523(a)(2)(A).

---

[7] To the extent Five Star contends otherwise, the Court's finding that Five Star could not have relied upon the falsified checks also precludes any argument that the debt is excepted from discharge under § 523(a)(2)(B) as a false statement in writing concerning Brock's financial condition.

MEMORANDUM OF DECISION - 16

C.  11 U.S.C. § 523(a)(4).

The Code provides that a discharge in bankruptcy does not

discharge any debt "for fraud or defalcation while acting in a fiduciary

capacity, embezzlement, or larceny".  11 U.S.C. § 523(a)(4).

1.  Fraud or defalcation while acting in a fiduciary capacity.

Five Star contends that Brock engaged in fraud or defalcation while

acting as a fiduciary, and thus the judgment is nondischargeable under

§ 523(a)(4).  The Court disagrees.

a.  Elements.

Pursuant to § 523(a)(4), Five Star must demonstrate that 1) an

express trust existed, 2) the debt was caused by fraud or defalcation, and

3) Brock acted as a fiduciary to Five Star at the time the debt was created.

*Banks v. Gill Distribution Ctrs., Inc.*, 263 F.3d 862, 870 (9th Cir. 2001).  The

term "fiduciary" is not to be construed expansively in the § 523(a)(4)

context:  it "covers only 'express' or 'technical trusts' and not trusts arising

out of 'the very act of wrongdoing.'" *Davis v. Aetna Acceptance Co.,* 293 U.S.

328, 333 (1934); *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1185 (9th Cir. 1996)

MEMORANDUM OF DECISION - 17

("the fiduciary relationship must arise from an express or technical trust, not a constructive, resulting, or implied trust").  In this circuit, statutory trusts may be included under § 523(a)(4).  *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th Cir. 1987); *see also Streibick v. Murrell (In re Murrell)*, 04.3 I.B.C.R. 122, 125-128 (Bankr. D. Idaho 2004) (holding that a debtor's status as a corporate officer or director, or as a member of a limited liability company, does not satisfy the requisite federal standard for "fiduciary capacity" even though state law may identify such a person as a fiduciary for other purposes); *Cornforth v. Wahlen (In re Wahlen),* 02.4 I.B.C.R. 179, 180–81 (Bankr. D. Idaho 2002).  Thus, any constructive, implied or resulting trust created by the conduct of the parties or by statute does not give rise to a fiduciary relationship required by § 523(a)(4).  Accordingly, in order for Five Star's § 523(a)(4) cause of action to be valid, it must be able to demonstrate the existence of an express trust created either under the Agreement, or by statute.

The burden is initially upon Five Star to prove that Brock was a fiduciary to whom funds had been entrusted, and that those funds were

MEMORANDUM OF DECISION - 18

not paid over or otherwise accounted for.  *Otto v. Niles (In re Niles)*, 106

F.3d 1456, 1462 (9th Cir. 1997).  After such a showing has been made, the

burden shifts to Brock to fully account for all funds received by him for the

benefit of Five Star.  *Id*.

<u>b.  Analysis</u>.

Five Star argues that a federal trucking regulation, 49 C.F.R.

§ 376.12, creates a statutory trust relationship between Brock and Five Star.

"[A]" statutory fiduciary is considered a fiduciary for the purposes of

§ 523(a)(4) if the statute:  (1) defines the trust res; (2) identifies the

fiduciary's fund management duties; and (3) imposes obligations on the

fiduciary prior to the alleged wrongdoing."  *Blyler v. Hemmeter (In re*

*Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001).

The regulation upon which Five Star relies, provides:

> Payment period.  The lease shall specify that
> payment to the lessor shall be made within 15
> days after submission of the necessary delivery
> documents and other paperwork concerning a
> trip in the service of the authorized carrier.  The
> paperwork required before the lessor can receive
> payment is limited to log books required by the

MEMORANDUM OF DECISION - 19

Department of Transportation and those
documents necessary for the authorized carrier to
secure payment from the shipper.  In addition,
the lease may provide that, upon termination of
the lease agreement, as a condition precedent to
payment, the lessor shall remove all identification
devices of the authorized carrier and, except in
the case of identification painted directly on
equipment, return them to the carrier.  If the
identification device has been lost or stolen, a
letter certifying its removal will satisfy this
requirement.  Until this requirement is complied
with, the carrier may withhold final payment.
The authorized carrier may require the
submission of additional documents by the lessor
but not as a prerequisite to payment.  Payment to
the lessor shall not be made contingent upon
submission of a bill of lading to which no
exceptions have been taken.  The authorized
carrier shall not set time limits for the submission
by the lessor of required delivery documents and
other paperwork.

49 C.F.R. 376.12(f).

This regulation does not meet the requirements necessary to render

Brock a statutory fiduciary for the purposes of § 523(a)(4).  The trust res is

not defined by the regulation, Brock's duties *as a fiduciary* are not

identified, and no intention to create a trust is clear from the language of

MEMORANDUM OF DECISION - 20

this regulation.  In short, honoring the Supreme Court's directive that

fiduciaries in the § 523(a)(4) context are to be construed narrowly, the

Court concludes that no statutory trust exists here.

Five Star also contends that the Agreement creates a trust.  Again,

the Court disagrees.  Nothing in the Agreement manifests any intent of the

parties to create a trust.  Rather, the Agreement merely contains language

to comply with 49 C.F.R. 376.12, and requires payment from Timberline to

Brock within fifteen days.  This contract language created an obligation by

Timberline to pay Five Star, but it is insufficient to create a fiduciary

relationship for purposes of § 523(a)(4).[8]

2.  Embezzlement.

Five Star next argues that its state court judgment should be deemed

nondischargeable because this debt resulted from Brock's embezzlement

of Five Star's funds.

---

[8] Because the Court concludes that no trust relationship existed between
Brock and Five Star, it need not consider whether the debt was caused by fraud
or defalcation, and whether Brock acted as a fiduciary to Five Star at the time the
debt was created.

MEMORANDUM OF DECISION - 21

### a.  Elements.

Embezzlement in the § 523(a)(4) context has been defined as "the

fraudulent appropriation of property by a person to whom such property

has been entrusted or into whose hands it has lawfully come."

*Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551,

555 (9th Cir. 1991).  Three elements are necessary to prove embezzlement

in this context:  "(1) property rightfully in the possession of a nonowner;

(2) nonowner's appropriation of the property to a use other than which [it]

was entrusted; and (3) circumstances indicating fraud."  *Id.*; *First Delaware*

*Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (9th Cir. BAP 1997); *Kiss*

*Enters., Inc. v. Mirth (In re Mirth)*, 99.4 I.B.C.R. 148, 151 (Bankr. D. Idaho

1999).  Five Star has not proven these required elements.

### b.  Analysis.

The money owed to Five Star properly came into the possession of

Brock through Timberline, and thus, arguably, the first required element is

met.  However, the two remaining elements have not been proven.

MEMORANDUM OF DECISION - 22

There is no evidence that Brock retained monies owed to Five Star and used them for his own purposes. Five Star argues that Brock testified at trial that payment was received by Timberline for some of the loads shown on Exhibit 101. However, after observing Brock's testimony, it seems clear to the Court that Brock had no definite idea concerning which loads were paid, and which were not. When he was first shown the accounting, Exhibit 101, he apparently did not realize that the exhibit reflected unpaid loads. While he seemed to know that Five Star had been paid for some, but not all, of its loads, he did not know any specifics regarding individual loads.

The other evidence relied upon by Five Star to support this theory concerns the loads referred to in the altered checks. Again, while it is clear that the checks were altered, and that Five Star did not receive payment for the loads indicated on those checks, it is uncertain whether Brock or Timberline ever received payment for those loads from its customers. Without proof that payment had been made to Timberline for those loads,

MEMORANDUM OF DECISION - 23

Five Star's evidence does not support an inference that funds had been embezzled.

### 3. Larceny.

Finally, Five Star contends that Brock's conduct amounted to larceny, thus making the judgment nondischargeable.

### a. Elements.

To prevail under § 523(a)(4) on the basis of larceny, a creditor must prove "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the [debtor's] use without the consent of the owner. As distinguished from embezzlement, the original taking of the property must be unlawful." 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. rev. 2009); *see also U-Save Auto Rental of Am. v. Mickens (In re Mickens)*, 312 B.R. 666, 680 (Bankr. N.D. Cal. 2004).

### b. Analysis.

Here, Five Star has not, and can not, prove that the original taking of the money by Timberline was unlawful. The carrier, Timberline, and

MEMORANDUM OF DECISION - 24

Brock as its principal, had the legal right to receive the funds in the first

instance from the various shippers.  In other words, that Timberline and

Brock received the full amount of payments from shippers in the first

instance was not unlawful.  There is no basis for Five Star's suggestion that

Brock is guilty of larceny.

D.  11 U.S.C. § 523(a)(6).

Section 523(a)(6) provides that debts arising "for willful or malicious

injury by the debtor to another entity or to the property of another entity"

will not be discharged.

1.  Elements.

In order to except a debt from discharge under § 523(a)(6), a creditor

must prove, by a preponderance of the evidence, that the debt arose due to

willful and malicious injury by the debtor.  *Spokane Ry. Credit Union v.*

*Endicott (In re Endicott)*, 254 B.R. 471, 475 (Bankr. D. Idaho 2000) (citing

*Grogan*, 498 U.S. at 291).  Like other objections to dischargeability, claims

under § 523(a)(6) are narrowly construed against the creditor.  *See Snoke v.*

*Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

MEMORANDUM OF DECISION - 25

A breach of contract claim can support an exception to discharge under § 523(a)(6) only if it is accompanied by tortious conduct. *Lockerby v. Sierra*, 535 F.3d 1038, 1040-41 (9th Cir. 2008). Conduct is tortious for purposes of § 523(a)(6) only if it constitutes a tort under state law. *Id.* at 1041.

In this case, Five Star argues that Brock committed the tort of conversion. Although bankruptcy law determines the dischargeability of debts, state law determines whether a conversion has occurred. *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1206 n.16 (9th Cir. 2001); *In re Cracchiolo*, 00.2 I.B.C.R. at 87. Under Idaho law, conversion is defined as "a distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein." *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999).

> [I]f possession of property was not acquired by a tortious taking or the possessor does not appropriate or use the property in a fashion to indicate a claim thereto adverse to the owner, then no evidence of a conversion exists until there is proof, first, that a proper demand for possession was made by the one who is entitled

MEMORANDUM OF DECISION - 26

> thereto and, second, that the possessor
> wrongfully refused delivery.

*Id*. at 616-17.  In addition, the fact that a conversion is present does not

always mean that a willful and malicious injury has occurred.  *Peklar v.*

*Ikerd (In re Peklar)*, 260 F.3d 1035, 1037-39 (9th Cir. 2001) (holding that

conversion is not *per se* a willful and malicious injury to property of

another; it establishes only wrongful assertion of dominion and does not

necessarily decide other requisite § 523(a)(6) elements).

> 3.  Analysis.

Under the case law, Five Star must first prove Brock converted

monies due to Five Star for loads it hauled.  Absent a conversion, there is

no basis to determine that Brock's conduct was sufficiently "willful" and

"malicious" to support an  exception to discharge.  *Peklar*, 260 F.3d at 1038

("a failure to prove conversion is fatal to an argument that defendant's

conduct caused 'willful and malicious injury.'").

The record before the Court does not establish that Brock retained

payment for any loads Five Star hauled.  Rather, the evidence shows an

MEMORANDUM OF DECISION - 27

accurate accounting, aside from the loads involving the falsified checks, from both Five Star and Brock, of loads that had been paid, and those that had not.

The best evidence in the record to support Five Star's conversion theory is the loads involving the altered checks. However, it is not clear that Brock or Timberline had, in fact, been paid for those loads by the shippers. Because the business records were not placed in evidence, and because Debra Brock did not testify, it would be mere speculation whether Brock had actually been paid for those loads and retained the money for his own purposes, or whether Debra was simply trying to have it appear that Timberline was not as far behind on payments to Five Star as previously thought. Without proof that a conversion occurred, Five Star cannot prove the judgment debt is nondischargeable under § 523(a)(6).

## *Conclusion*

Five Star has failed to prove that the judgment it obtained in state court is nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6).

MEMORANDUM OF DECISION - 28

Accordingly, a separate judgment will be entered in this action in favor of

Brock, and the Five Star judgment debt will be subject to discharge.

Dated:  June 2, 2009

_____

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 29